FILED
18-0852
6/12/2020 3:22 PM
tex-43710508
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

# IN THE SUPREME COURT OF TEXAS

No. 18-0852

MO-VAC SERVICE COMPANY, INC., PETITIONER

v.

PRIMITIVO ESCOBEDO, INDIVIDUALLY, SAN JUANITA ESCOBEDO, INDIVIDUALLY,
AND MARTHA ESCOBEDO, INDIVIDUALLY AND AS REPRESENTATIVE OF
THE ESTATE OF FABIAN ESCOBEDO, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS

**Argued February 26, 2020**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

JUSTICE GUZMAN filed a concurring opinion.

JUSTICE LEHRMANN did not participate in the decision.

The Texas Workers' Compensation Act (the Act) provides that statutory benefits are the exclusive remedy for a covered employee or his legal beneficiary against his employer for work-related injury or death.[1] But in upholding the Act in 1916, three years after it was passed,

---

[1] TEX. LAB. CODE § 408.001(a) ("Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or

we excepted an action for intentional injury to an employee that we viewed as protected by the Texas Constitution's Open Courts provision.[2] The Legislature has never codified or rejected that intentional-injury exception to the Act's exclusive remedy, and we have reaffirmed it.[3]

Relying on the *Restatement (Second) of Torts*, we have defined intent as having two parts, one purposive—that "the actor desires to cause consequences of his act"—and the other shown by his "belie[f] that the consequences are substantially certain to result from it."[4] The latter component has proven difficult to apply, in Texas and elsewhere, especially in workers' compensation cases.[5] The case before us presents the opportunity to provide clarification.

We reverse the judgment of the court of appeals[6] and render judgment for the petitioner employer.

---

an agent or employee of the employer for the death of or a work-related injury sustained by the employee."). An exception in § 408.001(b) for certain wrongful death actions is not involved in this case.

[2] TEX. CONST. art. I, § 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law."); *Middleton v. Tex. Power & Light Co.*, 185 S.W. 556, 560 (Tex. 1916) ("It is . . . not to be doubted that the Legislature is without the power to deny the citizen the right to resort to the courts for the redress of any intentional injury to his person by another. Such a cause of action may be said to be protected by [Article I, § 13 of] the Constitution and could not be taken away; nor could the use of the courts for its enforcement be destroyed.").

[3] The current Act was adopted in 1993. *Wausau Underwriters Ins. Co. v. Wedel*, 557 S.W.3d 554, 562 (Tex. 2018). Three years later, in *Medina v. Herrera*, 927 S.W.2d 597, 600 (Tex. 1996), we noted that "[t]here is no express provision in either [the current Act] or the former act expressly excluding coverage for an injury resulting from an employer's intentional tort", but we concluded that the current Act "embodies the rule of *Middleton* and its progeny."

[4] *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 406 (Tex. 1985) (quoting RESTATEMENT (SECOND) OF TORTS § 8A (1965)).

[5] *See* RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 1 cmt. a (2010).

# I

Petitioner Mo-Vac Service Company, Inc. is a trucking and warehousing company servicing the oil patch from several Texas cities including Dilley, a small town some 70 miles southwest of San Antonio. Mo-Vac employed more than 30 drivers operating out of the Dilley yard, hauling liquids to and from drilling sites in eighteen-wheeler tanker trucks. One of them, Fabian Escobedo, 48, a 12-year employee, died when his rig ran off the highway and rolled over in the early morning hours of May 30, 2012. His estate representative is suing to recover damages for his pain and suffering before he died.[7]

Plaintiff contends that Escobedo fell asleep at the wheel due to fatigue from being forced to work grueling hours. Mo-Vac is a subscriber to the workers' compensation system. As we explain more fully below, Plaintiff can succeed only by proving that Mo-Vac intentionally caused Escobedo's accident in the sense that it believed the accident was "substantially certain to result" from his being overworked.[8] There is evidence that Mo-Vac forced Escobedo to work excessive hours. The question is whether there is any evidence that Mo-Vac believed his accident was substantially certain to result.

---

[6] 592 S.W.3d 467 (Tex. App.—Corpus Christi–Edinburg 2018).

[7] *See* TEX. CIV. PRAC. & REM. CODE § 71.021(b) ("A personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person."). Escobedo's parents, Primitivo and San Juanita Escobedo, and his sister and estate representative, Martha Escobedo, sued Mo-Vac for wrongful death and breach of Escobedo's employment agreement. Section 408.001(b) of the Act excepts from its exclusive remedy an action for "recovery of exemplary damages by the surviving spouse or heirs of the body of a deceased employee whose death was caused by an intentional act or omission of the employer or by the employer's gross negligence." The Escobedos are not the decedent's surviving spouse or heirs of his body and thus lack standing to sue under that provision. The trial court granted summary judgment for Mo-Vac on those claims, and the court of appeals affirmed. The Escobedos have not complained of that ruling here.

Escobedo's time records show that in the eight days leading up to the accident, he worked 137 hours, averaging 17 hours a day. He worked 20 hours three days before the accident, 14 hours two days before, and 19 hours the previous day—in total, all but 19 hours out of 72.[9] Plaintiff's expert estimated that the day before the accident, Escobedo had only a few hours' rest before leaving the Dilley yard about 9:00 p.m. to make deliveries at two wellsites. The expert further estimated that Escobedo arrived at the first well about 9:30 p.m. and the second about 1:30 a.m., staying an hour at each. He traveled a two-lane state highway that he knew well. About 3:00 a.m., 30 minutes into his three-hour return to Dilley, Escobedo rounded a slight curve to the left in a rural area, struck a delineator pole, and veered onto the improved right-hand shoulder and a grassy area. He tried to swerve back onto the highway but overcorrected, rolling his truck and trailer. He was not wearing a seat belt and died of positional asphyxia.

Mo-Vac was pushing all its drivers hard to keep up with business demands in the west and south Texas oil boom. Their working conditions are described in an affidavit by their manager, Urbano Garza, as follows.[10]

---

[8] *Reed Tool*, 689 S.W.2d at 406 (quoting RESTATEMENT (SECOND) OF TORTS § 8A).

[9] A driver's total number of hours is not necessarily commensurate with the time the driver spent on the road driving. In 2012, federal and state truck driving regulations allowed companies to pay drivers and bill customers for "off duty waiting" time in line on the oilfield, which did not count against drivers' maximum hours. Mo-Vac introduced testimony that drivers often slept or rested while waiting on site. In the two days before Escobedo's accident, he logged 22.5 hours of "off duty" or "off duty waiting" time.

[10] Garza admitted that though he was Escobedo's terminal manager at the time of his death, "I . . . was on personal leave vacation at the time of his death." Nevertheless, he added, he was "familiar with the accident and its cause . . . [,] was involved in the company's (limited) investigation of the crash and its cause, and . . . was intimately familiar with the company's driving, overtime, rest, and dispatch policies at the time of the crash."

Garza stated that he was "forced" by "clear directive" from upper management "to have the drivers work unsafe hours rather than let a competitor get the jobs which were demanded by our customers." Even though it was "obviously unsafe to nearly everyone in company management," Mo-Vac drivers were "routinely working 100 hours or more per week" and "19 to 24 hours straight—day after day." "It was becoming insane." If he "mentioned it as a concern", Garza said, he "would get an 'ear full' or a verbal reprimand from [his] supervisors about keeping production up at all costs." Because Mo-Vac was not adding enough drivers, "[m]aking the current drivers do overtime was the only way to get the production higher." In the frenzied months before Escobedo's accident, he had logged as many as 138 hours of overtime for a two-week pay period and other drivers logged even more. The record reflects that several Mo-Vac drivers had logged well over 200 hours of overtime in a single paycheck period.

According to Garza, Mo-Vac knew its drivers' hours violated state standards and encouraged them to "alter their work logs to appear that they were in compliance with DOT sleep and rest regulations". Mo-Vac's compliance clerk, Garza said, reportedly walked drivers "through the process of cheating" on their logs, moving work from one day to another. The clerk told drivers that doing so would "make it appear that they did not exceed the number of straight hours worked" without rest. Garza stated that senior management "indicated that they were aware of the practice and nevertheless encouraged it." When supervisors expressed safety concerns, they were "shut down" by management. Garza said Mo-Vac's operations manager, Mike Flanagan, "would tell me to get the numbers [of driving hours] up and told me to simply tell the drivers 'don't get killed out there.'" Garza was kept so busy managing the production

Mo-Vac "insisted upon" that it was "impossible for [him] to monitor" the hours of "each and every one of the drivers."

Garza's affidavit continues:

> When I mentioned to Mr. Flanagan that one of our drivers was going to get killed because of our insistence on unreasonable driving hours, he said to me: "we will cross that bridge when we come to it." His verbal statements and interactions with me and other staff members demonstrated to me that he was clearly anticipating an eventual injury or death, but intentionally pressed for more production because of the opportunity to make immediate money. By his actions and statements he made it clear that he did not want anything (including compliance with safe rest periods) to get in the way. From what I personally observed of upper management's behavior at MoVac in 2012, and at the time of Mr. Escobedo's death, they demonstrated verbally that they were plainly aware of the substantial certainty that one of my drivers, including Mr. Escobedo, would be injured or killed due to overwork. What I witnessed was not mere carelessness or recklessness. It was intentional conduct that I observed. They made it clear, through their actions and words, that they were more concerned with the immediate prospect of making money—even when I verbally confronted them with the clear and certain tragedy waiting to happen. Mr. Flanagan was not simply dismissive of the possibility of a crash—instead, on more than one occasion, he acknowledged to me his awareness that a crash was inevitable and indicated to me that we should press on with getting the production up, because there was money to be made.

To make matters worse, Garza stated, drivers had poor sleeping conditions. Trucks did not have sleeper berths, and Mo-Vac encouraged drivers "to sleep on a sheet of plywood stretched across their seats." "[W]orking long hours", he said, "it [wa]s difficult to get by with catnaps". Mo-Vac managers "knew this, and really did not care."

"Based on what I observed as company policy and practice," Garza concluded, "the cause of Mr. Escobedo's death was fatigue caused by an intentional practice of overworking drivers and falsifying logs."

> [F]rom what I observed, it would be simply impossible for the management at MoVac to have been unaware in May of 2012 that they were going to cause an

injury or death. They intentionally placed my drivers, including Mr. Escobedo, in a situation that they acknowledged was substantially certain to injure or kill one of the drivers. They wanted to make money. From what I observed, Mr. Escobedo's death was caused by greed.[11]

The trial court granted Mo-Vac's no-evidence motion for summary judgment. The court of appeals reversed and remanded, concluding that whether Mo-Vac believed its conduct was substantially certain to cause Escobedo's death remained an issue of fact.[12]

We granted Mo-Vac's petition for review.

## II

Plaintiff does not contend that Mo-Vac purposefully killed Escobedo but instead that Mo-Vac believed his accident was substantially certain to result from being overworked.

## A

"The Texas Legislature enacted the Act in 1913 in response to the needs of workers, who, despite escalating industrial accidents, were increasingly being denied recovery."[13] "Covered employees sustaining work-related injuries are guaranteed prompt payment of their medical bills and lost wages without the time, expense, and uncertainty of proving liability under common-law theories."[14] The employee may "recover without establishing the employer's fault and without regard to the employee's negligence."[15] "In exchange, the Act prohibits employees from seeking

---

[11] Mo-Vac objected to much of Garza's affidavit as conclusory and hearsay, but for purposes of our analysis, we take it as admissible and true.

[12] 592 S.W.3d 467, 478 (Tex. App.—Corpus Christi–Edinburg 2018).

[13] *Kroger Co. v. Keng*, 23 S.W.3d 347, 349 (Tex. 2000).

[14] *TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 72 (Tex. 2016).

7

common-law remedies from their employers by making workers' compensation benefits an injured employee's exclusive remedy."[16] "The Act ultimately struck a bargain that allows employees to receive 'a lower, but more certain, recovery than would have been possible under the common law.'"[17]

Whether that bargain "violate[d] any of [employers' or employees'] fundamental rights" was decided by this Court three years later in *Middleton v. Texas Power & Light Co.*[18] Analyzing the Act and its consequences in detail, we easily answered no for employers because the Act left them "free to adopt its plan of compensation, or remain ungoverned by it."[19] As for employees, we held that the Legislature could substitute statutory remedies for those at common law.[20] But "[h]ere", we said, "the character of injuries, or wrongs, dealt with by the Act becomes important. Notwithstanding the breadth of some of its terms, its evident purpose was to confine its operation to only accidental injuries, and its scope is to be so limited."[21] Noting that Article I, § 13 of the Texas Constitution preserves for "every person for an injury done him . . . [a] remedy by due course of law", we stated that it was

> not to be doubted that the Legislature is without the power to deny the citizen the right to resort to the courts for the redress of any intentional injury to his person

---

[15] *Kroger Co.*, 23 S.W.3d at 349.

[16] *TIC Energy*, 498 S.W.3d at 72–73.

[17] *SeaBright Ins. Co. v. Lopez*, 465 S.W.3d 637, 642 (Tex. 2015) (quoting *Kroger Co.*, 23 S.W.3d at 350).

[18] 185 S.W. 556, 559 (Tex. 1916).

[19] *Id.*

[20] *Id.* at 560.

[21] *Id.*

8

by another. Such a cause of action may be said to be protected by the Constitution and could not be taken away; nor could the use of the courts for its enforcement be destroyed. This Act does not affect the right of redress for that class of wrongs. The injuries, or wrongs, with which it deals are accidental injuries or wrongs.[22]

Both the Act and the Constitution drew a distinction between accidental and intentional injuries. Article XVI, § 26 of the Constitution provided, as it still does, that "[e]very person…that may commit a homicide, through wilful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving [spouse and the] heirs of his or her body".[23] The 1913 Act excepted such actions from its exclusive remedy.[24] Critical to our assessment of the Act's balance of employers' and employees' competing interests was its limitation to accidental injuries.

The exclusive-remedy provision is essential to the Act's continued success. As we wrote in *Reed Tool Co. v. Copelin*, "[i]f employers are required to provide not only workers' compensation but also to defend and pay for accidental injuries, their ability to spread the risk through reasonable insurance premiums is threatened, and the balance of advantage and detriment [between employers and employees] would be significantly disturbed."[25] The Legislature has amended the Act many times since 1913. It has never codified or rejected *Middleton*'s intentional-injury exception. After an overhaul of the Act in 1993, we noted that

---

[22] *Id.*

[23] TEX. CONST. art. XVI, § 26.

[24] Act of Mar. 29, 1913, 33d Leg., R.S., ch. 179, § 5, 1913 Tex. Gen. Laws 429, 430. The exception is now codified as § 408.001(b) of the Act. As explained in footnote 7, Plaintiff is ineligible to sue under that provision.

[25] 689 S.W.2d 404, 407 (Tex. 1985).

"[t]here is no express provision in either [what is now the current Act] or the former act expressly excluding coverage for an injury resulting from an employer's intentional tort."[26] We concluded that the current Act "embodies the rule of *Middleton* and its progeny."[27]

## B

We did not have occasion to interpret *Middleton*'s intentional-injury exception until 1985 in *Reed Tool*. There, a Reed Tool machine shop employee, Copelin, was injured when a chain tong on a lathe he was operating hit him in the head, leaving him severely brain-damaged and in a coma. Copelin's wife sued, alleging that Reed Tool had intentionally injured Copelin by requiring him to operate a machine despite knowing that it was defective and unsafe and that he was not properly trained. She further alleged that Reed Tool required him to work long hours in violation of applicable regulations.

We began by defining intentional injury. We first distinguished intent from other mental states. "The fundamental difference between negligent injury, or even grossly negligent injury, and intentional injury", we said, "is the specific intent to inflict injury."[28] We then looked to the *Restatement (Second) of Torts*, which defined intent to mean that "the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it."[29] In the first part of the definition, the actor is purposeful, as for example, if he drew back and slugged his victim on the jaw. Though the second part of the definition is

---

[26] *Medina v. Herrera*, 927 S.W.2d 597, 600 (Tex. 1996).

[27] *Id.*

[28] *Reed Tool*, 689 S.W.2d at 406.

10

something less than purposeful, we determined that "[t]he overwhelming weight of authority from other jurisdictions is that the common law liability of the employer cannot be stretched to include accidental injuries caused by the gross, wanton, willful, deliberate, intentional, reckless, culpable, or malicious negligence, breach of statute, or other misconduct of the employer short of genuine intentional injury."[30] Finally, we observed, quoting one authority:

> Even if the alleged conduct goes beyond aggravated negligence and includes such elements as knowingly permitting a hazardous work condition to exist, knowingly ordering claimant to perform an extremely dangerous job, wilfully failing to furnish a safe place to work, or even wilfully unlawfully violating a safety statute, this still falls short of the kind of actual intention to injure that robs the injury of its accidental character.[31]

The results might seem harsh, we conceded, but the determinative factor must be, "not the gravity or depravity of the employer's conduct but rather the narrow issue of intentional versus accidental quality of the injury."[32] The exclusive remedy is critical to the "continued effectiveness of the worker's compensation scheme".[33] "The intentional removal of a safety device or toleration of a dangerous condition may or may not set the stage for an accidental injury later", we said, "[b]ut in any normal use of the words, it cannot be said, if such an injury does happen, that this was deliberate infliction of harm comparable to an intentional left jab to the chin."[34] Accordingly, we held, "the intentional failure to furnish a safe place to work does not

---

[29] *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 8A (1965)).

[30] *Id.*

[31] *Id.* (quoting 2A A. LARSON, THE LAW OF WORKER'S COMPENSATION § 68.13 (1983)).

[32] *Id.* at 407.

[33] *Id.*

rise to the level of intentional injury except when the employer believes his conduct is substantially certain to cause the injury."[35]

Plaintiff's evidence of Reed Tool's intent was that "[t]he machine was nicknamed 'jaws,' and some employees did not want to operate it"; that "[t]here had been prior injuries on most of the lathes . . . as well as that particular machine", but that "[n]one . . . was debilitating, disabling, or in any way as serious" as Copelin's; and that "Reed Tool employees sometimes had to work twelve-hour shifts, seven days a week."[36] Copelin's supervisor testified that "Copelin was working 12-hour shifts and looked 'zonked.'"[37] While that evidence "might raise a question of fact concerning gross negligence," we said, "it does not raise a question of fact that Reed Tool knew with substantial certainty that [Copelin] would be injured."[38] We reversed the judgment of the court of appeals and affirmed summary judgment for Reed Tool.

## C

The definition of intent we drew in *Reed Tool* from the *Restatement (Second) of Torts* was not original with that edition. It was taken from the discussion of the intentional tort of battery in § 13 of the first *Restatement of Torts*. Battery was there defined as "[a]n act which, directly or indirectly, is the legal cause of a harmful contact with another's person".[39] One

---

[34] *Id.* (quoting 2A A. LARSON, THE LAW OF WORKER'S COMPENSATION § 68.13 (1982)).

[35] *Id.*

[36] *Id.* at 408.

[37] *Copelin v. Reed Tool Co.*, 679 S.W.2d 605, 607 (Tex. App.—Houston [1st Dist.] 1984), *rev'd*, 689 S.W.2d 404, 408 (Tex. 1985).

[38] *Reed Tool*, 689 S.W.2d at 408.

element of the tort was that "the act [be] done with the intention of bringing about a harmful or offensive contact or an apprehension thereof".[40] To be intentional, comment *d* explained:

> the act must be done for the purpose of causing *the* contact or apprehension or with knowledge on the part of the actor that *such* contact or apprehension is substantially certain to be produced. It is not enough that the act itself is intentionally done and this, even though the actor realizes or should realize that it contains a very grave risk of bringing about *the* contact or apprehension. Such realization may make the actor's conduct negligent or even reckless but unless he realizes that to a substantial certainty, *the* contact or apprehension will result, the actor has not that intention which is necessary to make him liable under the rule stated in this Section.[41]

The use of "the" and "such" make clear that an actor's intent must be directed toward a *particular* contact or apprehension, not merely a possibility of *some* contact or apprehension. This specificity is to be expected for a tort that involves an actor and an identifiable victim.

Section 8A of the *Restatement (Second) of Torts* extrapolated from comment *d* a general definition of "intent" which we quoted in *Reed Tool*: "that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it."[42] Comment *b* explained that "[i]f the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result."[43] The use of "consequences", while appropriate for a more general

---

[39] RESTATEMENT (FIRST) OF TORTS § 13 (1934).

[40] *Id.*

[41] *Id.* cmt. d (emphasis added).

[42] RESTATEMENT (SECOND) OF TORTS § 8A (1965).

[43] *Id.* cmt. b.

definition of intent applicable to acts other than battery, raises a subtle ambiguity. Are the "consequences" the ultimate result—for example, a personal injury—or the situation out of which the ultimate result arises? Injuries from motor vehicle accidents are certain to occur. The chances that you will be the injured person, all things being equal, are tiny.

The third *Restatement* retains its predecessor's definition of intent with a slightly clarifying change: "A person acts with the intent to produce *a* consequence if: (a) the person acts with the purpose of producing *that* consequence; or (b) the person acts knowing that *the* consequence is substantially certain to result."[44] The substitution of "a", "that", and "the" consequence for "consequences" indicates a discrete result more than a general situation. Thus, the third *Restatement*'s clarified definition confirms what we said in *Reed Tool*: the actor must intend the specific result, not merely the actions or circumstances leading up to the result.[45]

The third *Restatement* notes the difficulties courts have had applying the second *Restatement*'s definition of intent in workers' compensation cases. "Often . . . the most that can be said is that the employer has created a very dangerous job-site condition that the employer knows will eventually bring about an employee injury. Courts are divided in determining whether [that] situation justifies a tort claim by the employee against the employer under the workers'-compensation intentional-torts exclusion."[46] The *Restatement* suggests that "[t]he

---

[44] RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 1 (2010).

[45] *See Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 406–407 (Tex. 1985) (intentional conduct that only sets the stage for an accidental injury is insufficient); *see also Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 605 (Tex. 2016) ("[T]o prove an intentional nuisance, the evidence must establish that the defendant intentionally caused the interference that constitutes the nuisance, not just that the defendant intentionally engaged in the conduct that caused the interference.").

applications of the substantial-certainty test should be limited to situations in which the defendant has knowledge to a substantial certainty that the conduct will bring about harm to a particular victim, or to someone within a small class of potential victims within a localized area."[47]

But the localized-area limitation on applying the substantial-certainty test is problematic because it lacks definition. How small must a class of potential victims be? How small the localized area? How attenuated in time, distance, and other factors can the employer's conduct be from the employee's injury? No definite line can be drawn, and while the law is certainly accustomed to vague line-drawing, the balance drawn by the workers' compensation system in providing quicker but limited benefits in exchange for the uncertainties and expense of litigation calls for as much certainty as can fairly be provided.

**D**

Even if a localized-area limitation on the substantial-certainty test for intent were advisable, we effectively rejected it in *Reed Tool*. Plaintiff's argument for the intentional-tort exception to the Act's exclusive-benefit provision was that the employee was injured working long hours, in a single workplace, with only a few other employees, on one particular lathe known to be dangerous, by that very danger. This evidence, we very plainly stated, "does not raise a question of fact that Reed Tool knew with substantial certainty that [Copelin] would be

---

[46] RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 1 cmt. a. The criminal law must make a similar choice in determining the culpability standard for certain crimes. For example, the Model Penal Code generally "downplays the concept of intent" in favor of the dual standards of "purposely" and "knowingly". *Id.* (citing MODEL PENAL CODE § 2.02(2)(a)–(b) (1985)). For many crimes, either mens rea is sufficient—e.g., murder—but others are not satisfied by mere knowledge and require purpose—e.g., arson. *Id.* (citing MODEL PENAL CODE §§ 210.2, 220.1).

[47] *Id.* cmt. e.

15

injured."[48] For the intentional-tort exception to apply, the plaintiff was required to show that Reed Tool believed it was substantially certain her husband would be injured. The determinative factor, we said, must be, "not the gravity or depravity of the employer's conduct but rather the narrow issue of intentional versus accidental quality of the injury."[49] That certainty is necessary for the exclusive remedy, which, in turn, is critical to the "continued effectiveness of the worker's compensation scheme".[50]

We also said that "[t]he fundamental difference between negligent injury, or even grossly negligent injury, and intentional injury is the specific intent to inflict injury."[51] The third *Restatement* notes that the characterization, "specific", has not been altogether useful for drawing distinctions in applying the substantial-certainty test.[52] But in *Reed Tool* we referred to "specific" intent in the sentence immediately preceding our quotation of the definition of intent from the second *Restatement*. In that context, we meant by "specific" that an employer's belief that injury is substantially certain must be with respect to a particular employee from a definite risk. As we made clear, being overworked in an unsafe job environment is insufficient.

---

[48] *Reed Tool*, 689 S.W.2d at 408.

[49] *Id.* at 407.

[50] *Id.*

[51] *Id.* at 406.

[52] RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 1 cmt. a ("Some courts say that to prove an intentional tort for purposes of displacing the workers'-compensation exclusivity rule, the plaintiff must prove the employer's 'specific' or 'actual' intent to bring about an employee injury. Yet the traditional criminal-law concept of 'specific intent' is one that the Model Penal Code omits, finding it confusing and unhelpful. Moreover, given the particular issue raised by the worker injury cases, using the terminology of general versus specific intent is neither evocative nor illuminating.").

Plaintiff argues that requiring this degree of specificity will lead to absurd results. An actor who tosses a bomb with a slow-burning fuse into a roomful of people, Plaintiff suggests, will escape liability because he "did not know precisely when the bomb would explode and which people in the room it would kill." But a lit bomb tossed into a room of people is not merely substantially certain to inflict harm; it is purposive and thus easily qualifies as intentional.[53]

Our decision in *Rodriguez v. Naylor Industries, Inc.* illustrates the evidence that is needed for the intentional-tort exception.[54] Naylor's employee, Rodriguez, was told by his supervisor, Cameron, to drive a specific delivery truck on a specific 250-mile route from Rockdale to Corpus Christi by way of Port Lavaca. Rodriguez inspected the truck's six tires—two on the front axle and four on the rear—and reported to Cameron that they were cracked and had no tread and that the inner tube was even visible on one. Cameron responded: "That truck has to go to Port Lavaca and then . . . to Corpus Monday morning . . . . Either take it or walk."[55] Some 70 miles into the trip, one of the front tires blew out. Rodriguez hitchhiked four miles to the nearest town, called another Naylor supervisor, Wallace, in Houston, about 100 miles away, and asked him to bring a spare tire. When Wallace arrived, he instructed Rodriguez to replace the ruined front tire with

---

[53] The second *Restatement* uses a bomb hypothetical to illustrate the substantial-certainty test for intent. RESTATEMENT (SECOND) OF TORTS § 8A cmt. b, illus. 1 (1965) ("A throws a bomb into B's office for the purpose of killing B. A knows that C, B's stenographer, is in the office. A has no desire to injure C, but knows that his act is substantially certain to do so. C is injured by the explosion. A is subject to liability to C for an intentional tort."). We think the better category for this example is purpose because the actor deliberately intended the harmful consequence to those present in the room.

[54] 763 S.W.2d 411, 413 (Tex. 1989).

[55] *Id.* at 412.

one of the back tires. Though Wallace knew it was illegal to drive the truck without all six tires, he told Rodriguez to continue driving to a place where they could get a new tire. Rodriguez continued the trip with Wallace following him. Sixty miles later, the lone back tire on one side blew out, causing the truck to flip over, injuring Rodriguez.

The evidence showed that Cameron had to know that driving the truck in its condition was substantially certain to result in a blowout resulting in a loss of control. Cameron's order to "either drive the truck or walk" showed that he intended Rodriguez to risk the specific danger.[56] When a blowout did occur, Wallace's demand that Rodriguez keep driving also showed that he intended Rodriguez to continue to take a risk that was not only substantially certain but had already occurred once to the same driver in the same truck with the same problem an hour earlier. We held that the evidence raised a fact issue whether Naylor acted with intent.[57]

The temptation is for courts to search for ways to avoid harsh results and recompense injury from an employer's egregious behavior. But destabilizing the workers' compensation system is also a harsh result affecting all Texas employers and employees who benefit from it. Based on *Reed Tool* and consistent with *Rodriguez*, we hold that for the intentional-tort exception to the exclusive remedy to apply, the employer must believe that its actions are substantially certain to result in a particular injury to a particular employee, not merely highly likely to increase overall risks to employees in the workplace.

---

[56] *Id.* at 413.

[57] *Id.*

**E**

Finally, the *Restatement* definition of intent we adopted in *Reed Tool* requires not only that a substantial certainty of a particular injury to a particular employee exist but also that the employer "believe[]" that it does. In another context, we have explained that "[i]ntent is thus measured by a subjective standard, meaning the defendant must have actually desired or intended to create the [injury] or must have actually known or believed that the [injury] would result."[58] Of course, the employer need not admit to believing that his actions were substantially certain to result in injury to an employee. In *Rodriguez*, for example, there was no direct evidence that Naylor was substantially certain a truck tire would blow, injuring Rodriguez. But knowing the condition of the tires, knowing that one had already blown, and knowing that Rodriguez needed to be followed to get a new tire was, we concluded, evidence to raise a fact issue.

**III**

We turn, then, to whether there is evidence that Mo-Vac believed it was substantially certain Escobedo would fall asleep from overwork while driving the night of his accident.

Plaintiff argues that the testimony in Garza's affidavit that Mo-Vac intentionally demanded that its drivers work illegally long hours and falsify sleep records is sufficient to raise a fact issue as to whether Mo-Vac's intentional acts caused Escobedo's death. Mo-Vac argues that even if it knew it was substantially certain that one of its drivers would crash somewhere, someday, that is insufficient. Plaintiff must produce evidence that raises a fact issue as to

---

[58] *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 605 (Tex. 2016).

19

whether Escobedo's death was caused by Mo-Vac's intentional acts or omissions as we have interpreted intent under the intentional-injury exception.

Plaintiff's evidence fails to raise a fact issue as to whether Escobedo's accident was substantially certain. Substantial certainty will always be hard to quantify, and because hindsight is 20/20 the assessment is almost unavoidably skewed when the consequence is dire. Our caselaw requires the defendant to know that specific consequences are substantially certain to result from the defendant's conduct to prevent the intentional-injury exception from devolving into a standard of exceptionally egregious gross negligence.

Garza's affidavit indicates that Mo-Vac intended its drivers to work more hours in order to turn more profit, but that does not indicate that Mo-Vac intended a driver be killed on the job. Notably, Garza's affidavit speaks to Mo-Vac's practices and drivers in a general sense and provides no evidence that Escobedo's crash was substantially certain. Mo-Vac may have known that there was an ascertainable statistical chance that some of its drivers would be injured over some period of time and that the number of hours its drivers worked would impact that chance. But this evidence does not indicate that Mo-Vac intended a driver be killed on the job or that Escobedo's crash due to his grueling schedule was substantially certain.[59]

In workers' compensation cases, it is not enough to show that all the defendant's employees were at risk all the time due to overall dangerous job conditions, thus rendering any injury sustained inevitable. As the third *Restatement* explains, substantial certainty is not

---

[59] For this reason, Plaintiff's brake fluid analogy misses the mark. Plaintiff likens Mo-Vac's policies to telling the mechanic to stop refilling the hydraulic systems in its trucks to save money. Unlike driving a truck with

established when the identity of potential victims is vague, the time frame involved expansive, and the causal chain connecting conduct and harm relatively attenuated. Here, Escobedo was one of 30 drivers at Mo-Vac's Dilley terminal and one of an unknown total of Mo-Vac drivers. Even if the Dilley number is the relevant number and that number constitutes a "small class of potential victims within a localized area", which we do not suggest, Plaintiff's evidence does not narrow the time frame at all but leaves it impermissibly indefinite. Moreover, the causal sequence the evidence establishes is too attenuated, more akin to the recipe for eventual disaster in *Reed Tool*[60] than the direct causal chain in *Rodriguez*.[61]

Likewise, Plaintiff's evidence fails to raise a fact issue that Mo-Vac subjectively *believed* Escobedo's death was substantially certain to occur. As proof of Mo-Vac's alleged belief, Plaintiff relies on the operations manager's statement that "we will cross that bridge when we come to it" when confronted with Garza's warnings that a driver would get killed. If anything, the operations manager's statement demonstrates Mo-Vac's awareness that a crash was only *possible*, not that Mo-Vac believed a crash was substantially certain.[62] Indeed, the record reflects that other Mo-Vac drivers had worked significantly longer hours than Escobedo without incident, meaning Mo-Vac had no indication that Escobedo's crash was substantially certain to

---

no brake fluid, which must fail at a certain point in time like the bald tires in *Rodriguez*, the risks attendant to working long hours are constant every day on every route, indefinitely.

[60] *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 405 (Tex. 1985) (employee's injury was not substantially certain where employer required employees to work long hours and operate dangerous and defective machinery without proper training).

[61] *Rodriguez*, 763 S.W.2d at 413 (evidence that employer knew condition of tires but required employee to continue driving truck despite one tire blowout raised fact issue under substantial-certainty test).

occur. Garza himself testified that he was too busy to monitor any individual driver's hours, including Escobedo's and that he was on vacation at the time of Escobedo's crash. Further, federal and state truck driving regulations did not count "off duty waiting" time at the site against a driver's maximum hours, and Mo-Vac could pay the driver even if the driver was resting. In the two days before Escobedo's accident, he logged 22.5 hours of "off duty waiting" time, during which he could have been sleeping. Thus, relying only on the total hours Escobedo logged in the days leading up to his accident may paint a misleading picture of his schedule. In sum, Plaintiff's evidence merely shows Mo-Vac's awareness of the commonsense notion that fatigued drivers are more likely to be involved in a crash than well-rested drivers.[63]

Plaintiff also cites Garza's claim that Mo-Vac "intentionally" placed drivers in a situation that was "substantially certain" to injure or kill a driver. Though this statement parrots the language of the substantial-certainty test, the affidavit's claims, however troubling they may be, do not provide any specific evidence that Mo-Vac believed that Escobedo's accident was substantially certain.

In light of this evidence, we hold that Plaintiff failed to raise a fact issue on the applicability of the intentional-injury exception to the exclusive-remedy provision of the Act.

---

[62] *See cross that bridge when one comes to it*, MERRIAM-WEBSTER ONLINE (2020) (defining the idiom as "to not worry about a possible problem until it actually happens").

&ast; &ast; &ast; &ast; &ast;

We hold that Plaintiff's evidence does not raise a fact issue under the intentional-injury exception; thus, her claims are barred by the exclusive-remedy provision of the Act. Accordingly, we reverse the judgment of the court of appeals on her survival action and render judgment for Mo-Vac.

            Nathan L. Hecht
            Chief Justice

Opinion delivered: June 12, 2020

---

[63] *See State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 378 (Tex. 1993) (substantial certainty is more than "a foreseeable risk which a reasonable person would avoid" (citation omitted)).

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below:

Envelope ID: 43710508
Status as of 06/12/2020 15:24:06 PM -05:00

Associated Case Party: Mo-Vac Service Company, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Joel Vale | 24084003 | jvale@atlashall.com | 6/12/2020 3:22:06 PM | SENT |

Associated Case Party: Primitivo Escobedo

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Armando Duran | 793657 | apduran@rgv.rr.com | 6/12/2020 3:22:06 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Tammie Rodriguez | | tjr@atlashall.com | 6/12/2020 3:22:06 PM | SENT |
| Shiva Zamen | | szamen@jw.com | 6/12/2020 3:22:06 PM | SENT |
| Danica Milios | | dmilios@jw.com | 6/12/2020 3:22:06 PM | SENT |
| Susan Renee Sullivan | 11546700 | ssullivan@atlashall.com | 6/12/2020 3:22:06 PM | SENT |
| Mike Mills | 14163500 | mkmills@atlashall.com | 6/12/2020 3:22:06 PM | SENT |
| Aisha Milburn | | amilburn@jw.com | 6/12/2020 3:22:06 PM | SENT |
| Jennifer Caughey | | jcaughey@jw.com | 6/12/2020 3:22:06 PM | SENT |
| Nikki Mowbray | | nmowbray@atlashall.com | 6/12/2020 3:22:06 PM | SENT |
| Thomas Wright | | wright@wrightclosebarger.com | 6/12/2020 3:22:06 PM | SENT |
| Stuart Starry | | stuart@starrylaw.com | 6/12/2020 3:22:06 PM | SENT |
| Brian Cathey | | cathey@wrightclosebarger.com | 6/12/2020 3:22:06 PM | SENT |

Associated Case Party: Tyler Lee

| Name |
|------|
| Russell S.Post |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below:

Envelope ID: 43710508
Status as of 06/12/2020 15:24:06 PM -05:00

Associated Case Party: Tyler Lee

| Joshua S.Smith | | jsmith@beckredden.com | 6/12/2020 3:22:06 PM | SENT |
|---|---|---|---|---|
| Russell Stanley Post | 797258 | rpost@beckredden.com | 6/12/2020 3:22:06 PM | SENT |